# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-2276WM

_____

William R. Jones,                  *
                                   *
            Appellant,             *
                                   *   On Appeal from the United
      v.                           *   States District Court
                                   *   for the Western District
                                   *   of Missouri.
Paul Delo, Superintendent,         *
Potosi Correctional Center,        *
                                   *
            Appellee.              *

_____

Submitted:  November 13, 2000
Filed:   July 31, 2001

_____

Before RICHARD S. ARNOLD, BEAM, and BYE, Circuit Judges.

_____

RICHARD S. ARNOLD, Circuit Judge.

William R. Jones, Jr., a Missouri inmate sentenced to death for first-degree murder, appeals from the District Court's[1] denial of his second amended petition for a writ of habeas corpus filed under 28 U.S.C. § 2254.  He argues that he received

_____

[1]The Hon. Joseph E. Stevens, Jr., late a United States District Judge for the Western District of Missouri.  After Judge Stevens's death, petitioner's Fed. R. Civ. P. 59(e) motion to alter or amend the judgment was denied by the Hon. Howard F. Sachs, United States District Judge for the Western District of Missouri.

constitutionally ineffective assistance of trial counsel because of counsel's failure (1) to investigate and present evidence of mental disorder and organic brain damage at the guilt phase of the trial; and (2) to investigate and present mitigating evidence at the penalty phase of the trial. He also argues that his rights were violated by the District Court's denial of his request for an evidentiary hearing. After full consideration, we reject these claims. There are respects in which trial counsel can justly be criticized, but after taking into account what the evidence would have looked like without these deficiencies, we see no reasonable probability that the verdict would have been different.

## I. Trial

### A. Guilt Phase

This case involves the January 16, 1986, shooting death of Stanley Albert. The State presented the following evidence at trial, which took place on November 6 through 10, 1986. Mr. Jones, the petitioner, was a bisexual who lived in the Kansas City, Missouri, area, where he worked as a strip dancer in nightclubs. He was seen with Mr. Albert by the latter's daughter in the fall of 1985 in Mr. Albert's 1984 white Camaro, a car the victim was very proud of. Petitioner was 21 years old at the time and Mr. Albert was in his fifties. Beginning in December 1985, petitioner told several people, including his male roommate and lover, Charles Wesley Thomas, that his father was going to help him purchase a white Camaro. Petitioner's father had helped him purchase cars in the past and had discussed helping him buy another one, but had had no conversation with him about a white Camaro.

On or about January 10, 1986, petitioner asked Karla Wright, who had been his girlfriend for several years, what she would think of him if he killed someone. On January 13, petitioner told another woman friend, with whom he planned to go to Indianapolis for a dancing job, that he would drive because he was going to get a white

Camaro. On Wednesday, January 15, 1986, petitioner told Mr. Thomas that he would be getting his car the next day at 4:30 p.m. On January 16, at 4:30 p.m., Mr. Albert pulled up in front of petitioner's apartment in the Camaro. Petitioner borrowed a blanket from Mr. Thomas, and Mr. Thomas saw him leave with Mr. Albert in the car.

At about 8:00 p.m. that evening, petitioner called Mr. Thomas, told him he was in Independence, Missouri, drinking and driving around in his new car, and offered him a ride. Petitioner picked Mr. Thomas up in the Camaro at about 9:00 p.m. During the ride, petitioner crushed a pair of sunglasses that were lying on the seat of the car, saying the owner would not need them anymore. He left the apartment early the next morning, purchased a shovel using Mr. Thomas's credit card (without permission), and returned in the afternoon. He had a scratch on his face and told Mr. Thomas he had been at a park and got scratched by a tree branch. He complained to Mr. Thomas that he was tired, saying, "well, it gets pretty tiring when you drag a dead man through the woods." Petitioner had with him two license plates and told Mr. Thomas he had to give them back to the man who owned the car, and that his father was going to give him plates until his own came in. In fact, Petitioner's father was not involved in any way in acquiring the white Camaro, and the Kansas plates later found on the Camaro had been stolen.

On Saturday, January 18, at about 4:00 p.m., petitioner left his apartment with his woman friend in the Camaro to drive to Indianapolis. At about 5:30 p.m. that evening, the car was stopped for speeding on a highway outside Kansas City by a state highway patrol officer. As the officer approached, petitioner sped away and a high-speed chase ensued. The officer got up to 120 miles per hour, but petitioner still kept ahead of him. Eventually, petitioner eluded the officer and abandoned the car. He was arrested three miles away.

Mr. Albert did not report to work on Friday, January 17. On March 2, 1999, his body was found in a wooded area in a park near Independence. The medical examiner

estimated that he had been dead between two weeks and several months. The body was wrapped in a blanket identical in appearance to the one petitioner had borrowed from his roommate. Mr. Albert had been shot five times in the lower torso and chest. Three of the bullets had been fired from the same .22 revolver, and the other two could have been.

On April 1, 1986, petitioner was charged with stealing a motor vehicle, first-degree murder for the murder of Mr. Albert, and armed criminal action. In May, bullets of the same common type that had killed Mr. Albert, as well as two license plates that had been on Mr. Albert's car, and Mr. Albert's watch were found in petitioner's apartment. The watch and bullets were hidden between some paneling and a wall, underneath one end of a bathtub. The State proceeded only on the first-degree murder count.

At his first meeting with one of his two attorneys, who had been retained by his mother, petitioner gave the attorney a hand-written letter recounting his version of events on January 16, 1986. He wrote that Mr. Albert had asked him to go on a picnic on that day and that petitioner borrowed a blanket from his roommate to take along. Petitioner had a gun with him — he always carried it because he had previously been badly beaten up. Mr. Albert and petitioner went to a secluded area in a park, drinking some beer and wine on the way, and, after they ate, Mr. Albert made an explicit sexual advance. Petitioner called him a pervert and turned to leave, whereupon Mr. Albert grabbed petitioner by the arm.

Petitioner wrote further that when he pulled away from Mr. Albert he lost his balance and must have fallen. The next thing he remembered, he was sitting in the car at a nearby convenience store, partially unclothed. He went back to the park and found Mr. Albert's body in a ditch. He returned to his apartment in Mr. Albert's car. He was in pain, there was blood on his anus, and he realized he had been raped. He felt there was no one he could tell about it and was afraid his parents would find out. He did tell

his sister about the rape when she visited him in jail. Petitioner ended the letter by stating that he kept having flashbacks about "bright flames that would come from a gun and the noise it made."

Petitioner did not testify at the guilt phase of the trial. His defense consisted of pointing out that the State's case was circumstantial. The jury convicted petitioner of first-degree murder, which under Missouri law required a finding that he "knowingly cause[d] the death of another person after deliberation upon the matter." Mo. Rev. Stat. § 565.020. "Deliberation" is defined as "cool reflection for any length of time no matter how brief." Id. (3).

## B. Penalty Phase

The case proceeded to the penalty phase on November 13, 1986. The State presented evidence of petitioner's guilty plea to a charge of stealing over $150 for a January 1984 burglary of Ms. Wright's parents' home, and his guilty plea to a charge of stealing under $150 in February 1984. The State presented the testimony of Mr. Thomas that when he took petitioner to his family's home in Arkansas for Thanksgiving in 1985, petitioner burglarized a neighbor's house, and the testimony of Ms. Wright regarding the burglary of her parents' home, which occurred after she showed petitioner how to open the safe.

Petitioner took the stand and denied that he killed Mr. Albert. According to petitioner's testimony, he first met Stanley Albert at the Liberty Memorial. He struck up a conversation and told Mr. Albert that he jogged there every day. When petitioner first saw Mr. Albert, he was waxing the white Camaro. That same day, petitioner and Mr. Albert went back to petitioner's apartment. Mr. Albert washed his hands and left his watch by the sink. Later, petitioner further testified, on January 16, 1986, Mr. Albert called and talked about the car. He picked petitioner up in the car. He was looking at petitioner "romantically." Mr. Albert indicated that petitioner might help pay

for the car with sex. They went to a McDonald's and were in the parking lot there, eating. A friend of Mr. Albert's pulled up in a dark car. They talked. "It looked real serious." Mr. Albert asked petitioner to take his car and drive it over to the apartment and wait there, which he did. After about thirty minutes, he went back to McDonald's, but neither Mr. Albert nor the other man (who had been in a dark car) was there. Petitioner never saw Stanley Albert again, alive or dead. However, he kept the car and was driving it to Indiana with Julie Glidewell when he was arrested for speeding. He had no idea that Stanley Albert was dead. Petitioner also claimed that he stole the money from Ms. Wright's parents with her help so the two of them could run off together. The State did not cross-examine petitioner, and the defense presented no other witnesses on his behalf.

The jury found two aggravating circumstances — that petitioner murdered Mr. Albert "for the purpose of receiving money or any other thing of monetary value from Albert," and that petitioner murdered Mr. Albert while petitioner "was engaged in the perpetration of or the attempt to perpetrate robbery" — and sentenced him to death. The Missouri Supreme Court affirmed the conviction and sentence. State v. Jones, 749 S.W.2d 356 (Mo. 1988) (en banc).

## II.  State Post-Conviction Proceedings

### A.  Hearing

In his motion for state post-conviction relief, petitioner argued, inter alia, that trial counsel was ineffective for "failing to prepare and present an affirmative mitigating case" at the penalty phase of the trial. A hearing was held in January 1989, at which six witnesses testified: a forensic neuropsychologist, petitioner, petitioner's mother, his two trial attorneys, and a criminal defense attorney with expertise in capital murder cases in the county where petitioner was tried.

Dr. William O'Connor, the neuropsychologist, testified that he first interviewed and examined petitioner on September 12, 1988. Primarily based upon the results of Minnesota Multiphastic Personality Inventory test, he expressed the opinion that petitioner had a "mental disease or defect," namely, "ego dystonic homosexuality" and "disassociative disorder with panic attacks." "Ego dystonic homosexuality" refers to a person who engages in homosexual conduct but is unhappy about it or revolted by it. These diagnoses were made by reference to the Diagnostic and Statistical Manual (DSM III) published by the American Psychiatric Association. Dr. O'Connor offered his professional opinion that at the time of the offense petitioner experienced an "acute depersonalization disorder" and was not capable of appreciating the criminality of his conduct or conforming his conduct to law. According to Dr. O'Connor, petitioner had described a direct sexual proposition and advance by Mr. Albert and his own experience of panic. He did remember shooting a gun, but experienced intermittent memory loss in the process of the actual killing.

Dr. O'Connor also reported that petitioner's medical records indicated that in August 1985 he sustained brain damage from a head injury — "cerebral contusion in the left parietal area." Such an injury would "fairly severely compromise" one's judgment and cause anxiety and difficulty in controlling emotions and impulses. These effects often resolve after about eighteen months. On the basis of the extent of the injury and his examination of petitioner several days before the hearing, Dr. O'Connor believed that the effects of the August 1985 injury and brain damage were still operative in January 1986.

Petitioner testified that in his first meeting with one of his trial attorneys he told him that he had committed the crime, and that he wrote the document described above at counsel's request. He recounted how he first met Mr. Albert in the fall of 1985 while jogging in a park near the Liberty Memorial in downtown Kansas City. Mr. Albert was waxing his car, and petitioner stopped to talk to him about it and invited Mr. Albert to his apartment where they continued to talk about the car. Mr. Albert took off his watch

to wash his hands and inadvertently left the watch there. Petitioner commented that his sister had a Camaro, and Mr. Albert said the car seemed a bit too flashy for a person of his age, and he was probably going to be selling it soon.

Petitioner continued that they met again by chance two weeks later in the park. In January 1986, petitioner called Mr. Albert, and the picnic for the day of the murder was planned. He testified that after he had been badly beaten up in the park in August 1985, he and his roommate always carried a gun with them in the pocket of the coat they shared.

Petitioner's version of the events immediately surrounding the murder was somewhat different from the description in his letter to his attorneys. He testified that after Mr. Albert grabbed him and he lost his balance and fell on his stomach, Mr. Albert jumped on his back and started pulling his (petitioner's) pants down. All he could remember about the next twenty to thirty minutes was panic and pain. Somehow he then made it back to the car, which was about twenty-five yards away, and lunged into the back seat to get the gun from the coat which was lying there. When he got hold of the gun, Mr. Albert grabbed him by one of his ankles and started pulling him back out of the car. Petitioner turned around and blindly shot in Mr. Albert's direction.

Petitioner further testified that when he realized he had killed Mr. Albert, he took the body back into a wooded area of the park and covered it with the blanket he had borrowed from his roommate. He drove to a nearby convenience store, dropped the gun in a trash can, and called his roommate. The next day he bought a shovel to bury the body. He drove back to the park, but couldn't face seeing the body again, and left.

Petitioner testified that he told all this to his attorneys, who advised him that it would be best if he didn't take the stand, that the State's case was wholly circumstantial, and he should just sit back and let the State try to make its case. He relied on this

advice. He stated that he lied at the penalty phase when he denied killing Mr. Albert because he had already been convicted and he was "grabbing at anything."

Petitioner also testified about his childhood and how, before his parents' divorce when he was about twelve years old, his father beat him badly on many occasions. He stated that Ms. Wright's testimony that he asked her on January 10 what she would think if he murdered someone was false. Petitioner did tell his friends he would be getting the Camaro — his father had told him he would pay half of any car he wanted — but he denied that he specified he would be getting it the week or day of the murder. He believed that his friends lied about this point at the urging of Ms. Wright's father, who hated him.

Petitioner's mother testified to a chaotic home life until she divorced petitioner's father when her son was about eleven years old. She stated that her ex-husband had a bad temper and was abusive to the children, one time breaking a guitar over petitioner's head. She testified trial counsel never asked her about petitioner's childhood, and never asked her to testify on his behalf, which she would have been willing to do. She stated that trial counsel told her petitioner had a good case because the State had no actual facts.

The two attorneys who represented petitioner at trial, John Frankum and Kenneth Morgens, also testified. Neither had handled a capital murder case before. When asked why counsel never requested a mental examination of petitioner, Mr. Morgens responded, "We were never able to develop . . . what I consider to be an adequate factual basis . . . for a statement of allegation which would support in good conscience, and in my ethical obligation to the Court, a legitimate request for that examination." When reminded that he had been privately retained and would not need court approval for such an examination, he did not recall whether he considered asking the family for funds for this purpose.

Mr. Morgens further testified that the only witness deposed in preparation for trial was the medical examiner. He testified that the trial strategy was based on counsel's assessment that the State had a weak case because there was no direct evidence of when, where, and by whom Mr. Albert met his death. He acknowledged that counsel knew all the evidence the State had, such as that petitioner's roommate would testify that he saw petitioner leave with Mr. Albert on the day in question with the blanket.

With respect to preparation for the penalty phase, Mr. Morgens testified that counsel asked petitioner's mother and sister if there was anything they could say that would make petitioner out to be someone for whom the jury might feel some sympathy, and did not get any positive response to that inquiry. He stated that petitioner's mother and sister chose not to testify on petitioner's behalf. He also stated that petitioner was advised not to testify at the penalty phase, and that, when he took the stand, counsel did not know what he would say, because he had changed his story so many times in the past. He said that counsel had not gotten a consistent version of events from petitioner in the months they had been involved in the case.

The criminal defense attorney with expertise in capital murder cases testified next. When asked whether a reasonably competent criminal defense lawyer in the county where petitioner was tried would routinely have a mental evaluation conducted in a capital murder case, she responded: "There are few things in life you can be certain of but this is one of them. There is no capital case that you would not request a psychiatric evaluation of your client." She repeated this opinion with regard to a homosexual killing, and with regard to a defendant the State claimed murdered someone to get his car.

Petitioner's other trial attorney, John Frankum, was the last witness at the post-conviction hearing. He stated he believed that because the State only had circumstantial evidence, it was probable the court would grant a motion for judgment

of acquittal. He also testified that he didn't think petitioner's story set forth in his letter was a good one, and that it would be detrimental to him if he testified consistently with the letter at the guilt phase of the trial.

Mr. Frankum testified that to prepare for the penalty phase, he asked petitioner's mother, father, and sister if they had anything to say to the jury that would show petitioner to be a good person, or to be "the way he is for whatever reason." Mr. Frankum, like Mr. Morgens, testified that he did not know until just before the penalty phase began whether petitioner would decide to testify, that he did not know what petitioner would say on the stand, and that he did not recall advising petitioner as to what might be effective testimony.

## B. State Court Rulings

The state court, upon review of the record, including the trial transcript, rejected Dr. O'Connor's diagnosis of ego dystonic homosexuality and depersonalization disorder with borderline personality disorder, finding as follows:

> Movant [Mr. Jones] has been engaged in homosexual activity since the age of sixteen; met the victim while running in the area of the Liberty Memorial, a homosexual meeting place; was living with Wesley Thomas as his lover and roommate; and arranged for a date with the victim. Dr. O'Connor's diagnosis is inconsistent with these facts. . . . When Movant shot Stanley Albert, Movant was not acting under a homosexual panic.

These are findings of fact, and they are presumed to be correct if (to state the matter broadly) they are fairly supported by the record. See former 28 U.S.C. § 2254(d). There is such support in this case.

The Court accepted Dr. O'Connor's evidence with regard to petitioner's July 1985 head injury and the residual effects shown in the January 1989 tests, but stated:

"The Court finds that the head injury did not diminish Movant's capacity to know or appreciate the nature, quality, wrongfulness of his conduct or was incapable of conforming his conduct to the requirements of the law."

Accordingly, the state court denied the motion for post-conviction relief. This decision was affirmed by the Missouri Supreme Court. See Jones v. State, 784 S.W. 2d 789 (Mo. 1990) (en banc).

### III. Federal Habeas Action

### A.

Petitioner initiated the present case for federal habeas relief on October 16, 1990. After a second amended petition was filed raising over 30 grounds for relief, the District Court denied petitioner's motion for an evidentiary hearing, and denied the request for habeas relief. Petitioner's Fed. R. Civ. P. 59(e) motion to alter or amend the judgment was also denied,[2] and this appeal followed. This Court expanded the certificate of appealability to include the following three issues for appeal:

> (1) Whether trial counsel was ineffective in failing to develop or present evidence of petitioner's alleged mental disorder and/or organic brain damage during the guilt phase of the trial;

> (2) Whether trial counsel was ineffective in failing to investigate and present mitigating evidence at the penalty phase of the trial; and

---

[2]Following the death of Judge Stevens, the case was assigned to Judge Sachs, United States District Judge for the Western District of Missouri, who denied the Rule 59(e) motion "on limited examination." Petitioner argues on appeal that this was the wrong standard for reviewing his motion. Because our review of petitioner's claims is de novo, this argument is inconsequential.

(3) Whether the District Court erred in denying petitioner's request for an evidentiary hearing.

Although petitioner filed his habeas petition prior to the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), his right to appeal is governed by the certificate-of-appealability requirements found therein at 28 U.S.C. § 2253(c). See Slack v. McDaniel, 120 S. Ct. 1595, 1602 (2000). Thus this appeal is limited to the three listed issues. However, we apply pre-AEDPA standards in reviewing the case. See Lindh v. Murphy, 521 U.S. 320, 327 (1997). Under these standards, we review the District Court's conclusions of law de novo, and give the state court's factual findings a " presumption of correctness." Jackson v. Gammon, 195 F.3d 349, 353 (8th Cir.), cert. denied, 529 U.S. 1111 (2000); Reed v. Norris, 195 F. 3d 1004, 1005 (8th Cir. 1999).

B.

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must demonstrate that (1) "counsel's representation fell below an objective standard of reasonableness"; and (2) "the deficient performance prejudiced the defense." Id. at 687-88. Trial counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Id. at 691. "A fair assessment of attorney performance requires every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689.

To satisfy the second part of the Strickland test, the petitioner must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result

of the proceeding would have been different."  Id.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.

## C.

Petitioner argues that trial counsel were constitutionally deficient in failing to investigate his mental condition, especially in light of petitioner's letter, which described conduct akin to a dissociative experience and panic due to a homosexual assault.  Such an investigation would have uncovered petitioner's "mental defect" as diagnosed by Dr. O'Connor, as well as petitioner's brain damage resulting from the August 1985 head injury.  With this information, petitioner argues, competent counsel would have pursued a different trial strategy, namely, acknowledging that petitioner committed the murder, but not with "deliberation."  Such a strategy, it is said, could have produced a conviction of second-degree murder, which does not carry the death penalty.

For petitioner to prevail on this point we must conclude not only that trial counsel's performance was deficient, but also that there is a "reasonable probability" that a defense based upon Dr. O'Connor's opinions and petitioner's own testimony would have resulted in a verdict of not guilty of first-degree murder.  See, e.g., Steinkuehler v. Meschner, 176 F.3d 441, 445 (8th Cir. 1999).

Defense counsel were in a difficult situation in this case.  The facts were against any claim of innocence (except perhaps on the basis of self-defense, which is not a theory that petitioner has ever urged).  It may be that the State's case was "circumstantial," in the sense that there was no eyewitness and no confession.  Nor was there any physical evidence indisputably linking petitioner to the murder.  On the other hand, we think counsel underestimated the strength of the State's case.  Indeed, they themselves conceded at the post-conviction hearing that the State's case began to look stronger and stronger as more evidence was developed.  Still, what were counsel to do?

-14-

They had the "letter," giving petitioner's initial account of the incident, but they were skeptical of the persuasive value of any such defense, and we can understand why. In private consultations with counsel, petitioner's account of the killing (which he never denied) changed over time. A particularly telling example of such a change had to do with the consumption of alcohol. The document petitioner gave his lawyers said that he and Mr. Albert had drunk quite a lot after arriving at the nature area and climbing the tower to have their picnic. Later, the results of an autopsy of the victim became available, and the autopsy showed no alcohol in the body. Petitioner then changed his story and said he would testify that Mr. Albert had not been drinking. Counsel feared that petitioner simply would not stand up to cross-examination if he testified, during the guilt phase, to some such version of the events as recounted in the "letter." We do not think this was an unreasonable judgment.[3]

---

[3]How petitioner would have behaved under cross-examination is perhaps shown by what occurred at the post-conviction hearing. His cross-examination began as follows:

> Q. The story that you told here today about the way you murdered Mr. Albert, is that the same story that you told under oath at trial?
>
> A. I can't say for sure now. I couldn't say it was positively a replica of the same story I just told today.
>
>                       \*      \*      \*
>
> Q. Would it help jog your memory if I reminded you about your saying that Stanley Albert went to the McDonald's. Do you remember that?
>
> A. Yes.
>
> Q. And that some unknown man came up and drove off with him?
>
> A. Right. This was a story that I manifested for my lawyer . . ..

On the other hand, although we would not lay down any per se rule, it is probably true that defense counsel in a capital case should routinely have their client evaluated by a mental-health professional. Setting aside for a moment the diagnosis of "ego dystonic homosexuality" and other mental disorders, such an examination, coupled with an investigation of petitioner's hospital records, would have uncovered the severe beating petitioner had suffered in August of 1985 and the consequent (at least arguable) brain damage. This, in turn, would have enabled counsel to argue that petitioner had not been capable of cool deliberation. One difficulty with this approach is that, in order to follow this strategy fully, petitioner would have had to testify and admit the killing. Certainly it is possible to deny all involvement, or to put the State to its proof, while at the same time asserting that one was incapable of deliberation, but the argument is awkward and unlikely to be appealing to the practical judgment of jurors. We are clear on one thing: counsel at least should have investigated petitioner's hospital records and had them evaluated by an expert. This might have led them to a strategy better than the one ultimately selected.

We are cautioned against judging these matters with too much hindsight. Lawyers are not perfect, and the Constitution does not guarantee a perfect trial. Lawyers cannot make facts. They must deal with the facts as they find them. If, however, we assume that the lawyers were constitutionally defective in proceeding as they did at the guilt phase, the real question is, what difference would it have made?

\* \* \*

Q.    So did you lie under oath at your trial?

A.    Yes, I did.

Q.    And you just told us that the reason you lied under oath at your trial was because you thought it would help you?

A.    I was delirious. I don't even really know why I did it, to be honest.

-16-

Let's suppose that, at the guilt phase, petitioner had testified in accordance with his "letter," or some variation thereof, that the hospital records of brain injury had been introduced, and that Dr. O'Connor's expert testimony had also been placed before the jury. Is there a "reasonable probability" that the jury would not have convicted petitioner of first-degree murder? Or, as the Supreme Court has rephrased the "test," would our "confidence in the verdict be undermined"? Unhappily, these are not very certain standards, perhaps unworthy of the name "test." They require the exercise of judgment, a judgment especially difficult when someone's life is at stake. We have struggled with the issue in this case. On balance, however, we are not able to say that the theory now presented by petitioner (through able counsel) is sufficiently convincing to undermine our confidence in this verdict.

The major difficulty with the theory urged is the strong, if not overwhelming, evidence of advance planning and deliberation.[4] Petitioner had said for weeks that he was going to get a white Camaro. He had said, falsely, that his father would buy the car for him. He met Stanley Albert in a place frequented by homosexuals. Petitioner himself had had a number of homosexual relationships. He had invited Mr. Albert to pick him up for a picnic on Thursday, January 16, and had told his roommate beforehand that that was the day he was going to get the car. He left the apartment with a blanket, apparently later found covering the body, and a gun. He came back with the car and the watch. (Surely no one would believe Mr. Albert had left his gold watch at petitioner's apartment for months.) He had talked beforehand about killing someone, and had mentioned, after the fact, that he had dragged a body through the woods. He then attempted to cover his tracks by putting a stolen license plate on the car. In the face of all of this evidence, we think that the chances are small that the jury would have been convinced by Dr. O'Connor.

---

[4]There are also major problems with petitioner's credibility, as we have noted. Dr. O'Connor's testimony about mental disorders and a panic attack has to assume the truth of petitioner's (latest) version of events.

What about the penalty phase? If the jury, despite the different strategic approach we have described, had still convicted Mr. Jones of first-degree murder, would it perhaps have been persuaded by the psychological evidence not to sentence him to death? At this point, counsel could also have presented evidence that petitioner's father had beaten him. (We assume for present purposes that a reasonable investigation would have uncovered this evidence before trial, although apparently petitioner never mentioned it to his lawyers.) Again, the process of decision is difficult. The chance that such evidence would have made a difference may be somewhat greater with respect to the penalty phase. But ultimately, we conclude that the argument is not strong enough. Despite the abuse as a child, and despite the brain injury received in August of 1985, petitioner functioned in society at a substantial level of competence. He held a job, had relationships with men and women, and, as we have seen, was capable of detailed planning. It is our job to decide what the jury, expressing the moral judgment of the community, would have done had counsel pursued another strategy. We think that the jury's action would likely have been the same if petitioner had pursued the strategy now suggested. (Under this strategy, incidentally, petitioner would not have taken the stand and told the disastrous and obviously incredible story that he did during the penalty phase. To his counsel's credit, they advised him not to testify at this point, but he disregarded the advice.) We do not think that the Constitution requires that this verdict be disturbed.

Finally, we address the argument that the District Court erred in not holding an evidentiary hearing. A full and fair hearing had already been held in the state court. The presiding judge had taken an active and intelligent part, asking good questions of the psychological expert. Full and detailed findings of fact had been rendered. Not much additional evidence had been proffered for a federal-court evidentiary hearing. Additional experts were available, but their opinions, generally in accord with that of Dr. O'Connor, were available to the District Court in affidavit form. The District Court could have held an evidentiary hearing, see Clemmons v. Delo, 124 F.3d 944, 952 (8th

-18-

Cir. 1997), <u>cert. denied</u>, 523 U.S. 1088 (1998), but it did not abuse its discretion in declining to do so.

## IV.

We have read the transcript of the trial and the evidentiary hearing in the state motion court. For reasons we have attempted to explain in this opinion, petitioner's arguments do not persuade us. Accordingly, the judgment of the District Court, dismissing this petition for habeas corpus with prejudice, is

Affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.