RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 05a0406p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

BRIAN KEITH MOORE,

*Petitioner-Appellant,*

*v.*

No. 03-6105

PHILIP PARKER, Warden,

*Respondent-Appellee.*

>

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 99-00745—Thomas B. Russell, District Judge.

Argued: March 10, 2005

Decided and Filed: October 4, 2005

Before: BOGGS, Chief Judge; MARTIN and COOK, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:** Milton Coburn Toby, PERCH & TOBY, Lexington, Kentucky, William Yesowitch, BARBER, BANASZYNSKI & ASSOCIATES, Louisville, Kentucky, for Appellant. David A. Smith, OFFICE OF THE ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee. **ON BRIEF:** Milton Coburn Toby, PERCH & TOBY, Lexington, Kentucky, William Yesowitch, BARBER, BANASZYNSKI & ASSOCIATES, Louisville, Kentucky, for Appellant. David A. Smith, OFFICE OF THE ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee.

COOK, J., delivered the opinion of the court, in which BOGGS, C. J., joined. MARTIN, J. (pp. 7-18), delivered a separate dissenting opinion.

───────────────

**OPINION**

───────────────

COOK, Circuit Judge. Brian Keith Moore, a Kentucky prisoner under sentence of death, appeals the district court's denial of his petition for a writ of habeas corpus. For the following reasons, we affirm the district court and deny the writ.

## I. Background and Procedural History

In 1984, a Kentucky jury convicted Moore of the 1979 kidnaping, murder, and first-degree robbery of seventy-seven-year-old Virgil Harris. In the trial's penalty phase, the jury determined Moore committed the murder during the commission of first-degree robbery, and sentenced him to death.[1] The Kentucky Supreme Court affirmed the conviction and sentence, and the United States Supreme Court denied certiorari. *Moore v. Commonwealth*, 771 S.W.2d 34 (Ky. 1988) ("*Moore I*"), *cert. denied*, 494 U.S. 1060 (1990).

In 1990, Moore filed a motion to vacate his sentence under Ky. R. Crim. P. 11.42 in the state trial court, alleging ineffective assistance of trial counsel. While that motion was pending, he filed a motion under Ky. R. Civ. P. 60.02 for a new trial based upon newly discovered evidence. The trial court allowed Moore to present evidence on this second motion during the Rule 11.42 hearing. It denied both motions in January 1997. The Kentucky Supreme Court affirmed, and the United States Supreme Court denied certiorari. *Moore v. Commonwealth*, 983 S.W.2d 479 (Ky. 1998) ("*Moore II*"), *cert. denied*, 528 U.S. 842 (1999).

Moore filed his petition for habeas corpus in the district court in November 1999, raising claims of ineffective assistance of counsel, trial errors, prosecutorial misconduct, and a due-process violation. He also claimed police obtained incriminating statements used against him at trial in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).

The magistrate judge recommended denying Moore's petition. He concluded that each of Moore's ineffective-assistance claims was either procedurally defaulted or meritless; that each alleged trial error was meritless; that the prosecutorial-misconduct claims were procedurally defaulted; that the due-process claim was procedurally defaulted and meritless; and that the *Miranda* claims were procedurally defaulted. The district court reviewed the portions of the magistrate judge's report and recommendation to which Moore had objected, adopted them, and denied Moore's petition.

Moore then obtained a certificate of appealability as to the following claims: (1) ineffective assistance of counsel based on counsel's failure to impeach a commonwealth witness, Doris Riddle; (2) ineffective assistance of counsel based on inadequate penalty-phase preparation; (3) error in restricting Moore's contact with his attorneys during a lunch break; (4) error in using the same jury for both the guilt and sentencing phases of the trial; and (5) cumulative error.

## II. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), we review a district court's legal conclusions de novo and its factual findings for clear error. *Hill v. Hofbauer*, 337 F.3d 706, 710 (6th Cir. 2003). We may not grant a writ of habeas corpus unless we conclude that the state court's decision: (1) was contrary to, or involved an unreasonable application of, clearly established federal law; or (2) was based on an unreasonable determination of the facts. *Armstrong v. Morgan*, 372 F.3d 778, 781 (6th Cir. 2004).

---

[1]The Kentucky Supreme Court had reversed an earlier conviction and death sentence. *Moore v. Commonwealth*, 634 S.W.2d 426 (Ky. 1982).

III.  Ineffective Assistance of Counsel

A.  Failure to Impeach

Moore argues that his trial counsel performed ineffectively by failing to impeach a commonwealth witness, Doris Riddle.  Riddle, an employee at the driver's license bureau, testified concerning the alibi of a second suspect, Kenneth Blair, whom Moore tried to target at trial as the real killer.  Riddle's testimony placed Blair at the license bureau in the same general time frame as the crime (as described by witnesses) and thus hurt Moore's attempt to blame Blair.  But Riddle had told police shortly after the murder that she did not know what time Blair came in to the license bureau—and Moore's counsel failed to impeach Riddle with this earlier inconsistent statement.

To support a Sixth Amendment ineffective-assistance claim, a defendant (or petitioner) must show (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To show prejudice, the defendant must show a reasonable probability that, but for counsel's deficient performance, the proceeding's result would have been different.  *Id.* at 694.

The Kentucky Supreme Court rejected Moore's claim in state post-conviction proceedings, finding that, although Moore's counsel was deficient for failing to impeach Riddle, that deficiency did not prejudice Moore, and therefore was not ineffective assistance under *Strickland*.  *See Moore II*, 983 S.W.2d at 482-84.  The Kentucky court gave three reasons for its lack-of-prejudice finding: (1) even considering Riddle's testimony, Blair's alibi was not air-tight—he could have committed the murder and still been at the license bureau during Riddle's time-frame; (2) other witnesses confirmed Blair's alibi; and (3) abundant evidence, including physical evidence and Moore's confession, demonstrated that Moore—not Blair—killed the victim.  *Id.* at 483-84.

Moore argues the Kentucky court unreasonably applied *Strickland* by creating a new requirement that to show prejudice, a defendant must demonstrate actual innocence or show that the jury had insufficient evidence to support its guilty verdict.  But the Kentucky court did not create any such requirement.  That court identified the correct standard for prejudice ("reasonable probability"), looked at the totality of the evidence (including the flaws in Blair's alibi and the overwhelming evidence against Moore), and found no reasonable probability of a different outcome in the absence of the error.  While Moore claims the state court considered the remaining evidence against him in an effort to create a sufficiency-of-the-evidence standard, the court properly looked at that evidence only to determine whether a reasonable probability of a different outcome existed.  *See, e.g.*, *Hicks v. Collins*, 384 F.3d 204, 215 (6th Cir. 2004) ("overwhelming evidence" of petitioner's guilt precluded reasonable-probability determination).

And even if the Kentucky court might have undervalued Riddle's testimony[2] (so we could possibly disagree with its ultimate decision), that decision did not constitute an *unreasonable* application of established Supreme Court precedent, sufficient to grant the writ.  *See Williams v. Taylor*, 529 U.S. 362, 411 (2000) ("[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.").  Thus Moore's first ineffective-assistance claim fails.

---

[2] Indeed, the prosecutor in closing argument described Riddle as "probably the most important witness in the entire case."

### B.  Penalty Phase

Moore also claims his counsel insufficiently prepared for the penalty phase.  Again he cites *Strickland* as the Supreme Court precedent allegedly violated, and again he fails because he cannot show prejudice.

Moore argues that his attorneys erred by (1) allegedly spending only about three percent of their preparation time on the penalty phase; (2) remaining unaware of ninety-five letters sent to the first trial court supporting him, which could have led them to more mitigating evidence; and (3) not having another psychologist examine him after the first one they selected proved to be a fraud.

Moore cannot show prejudice here.  He does not dispute that his attorneys researched his background and presented four witnesses who testified regarding his childhood at his sentencing hearing.  Another psychologist did interview Moore for three to four hours, and testified that Moore had various problems that began to emerge during childhood, including impulsiveness, poor judgment, behavior control, anger, and harmful emotional attachment to others.  The district court noted that this testimony "cast Moore as an easily angered, impulsive, out-of-control emotional leech with poor judgment."  So introducing more evidence of this background, as Moore desired, would likely have made him look even worse to the jury.  Thus counsel's failure to seek or present more background evidence was not even deficient performance, let alone prejudicial.  *See Strickland*, 466 U.S. at 691 (no deficiency where defendant gives counsel reason to believe that "pursuing certain investigations would be fruitless or even harmful").[3]

The cases Moore cites as comparable to his own are not.  All three involve situations in which counsel failed *entirely* to seek or present mitigating family-background evidence.  *See Wiggins v. Smith*, 539 U.S. 510 (2003) (due to minimal investigation, counsel presented no evidence of defendant's family history, which included severe childhood abuse); *Hamblin v. Mitchell*, 354 F.3d 482 (6th Cir. 2003) (counsel failed to seek mitigating evidence and thus did not learn of defendant's unpleasant childhood); *Frazier v. Huffman*, 343 F.3d 780 (6th Cir. 2003) (counsel presented no mitigating evidence except defendant's one-sentence statement).  Here, in contrast, counsel sought and presented the above-described mitigating evidence.  Because counsel did so, Moore cannot show prejudice.

### IV.  Denial of Counsel

Moore claims the trial court violated his Sixth Amendment right to counsel when it recessed for lunch in the middle of his testimony.  The court ordered Moore not to discuss his testimony with anyone, including his attorneys, during the 45-minute break, but allowed him to consult counsel regarding anything else.  Moore claims this order violated his right to counsel.

The Kentucky Supreme Court, considering Moore's direct appeal, rejected this argument. *See Moore I*, 771 S.W.2d at 39-41.  At the time of the Kentucky court's 1988 decision, *Geders v. United States* was the clearly established federal law on this issue.  425 U.S. 80 (1976).  But while Moore's petition for rehearing of that decision pended, the Supreme Court decided *Perry v. Leeke*, which further developed the law on this issue.  488 U.S. 272 (1989).  We therefore look to *Perry* to

---

[3] In arguing prejudice, the dissenting opinion points to "powerful" mitigating evidence that should have been presented to the sentencing jury.  Much of the evidence the dissenting opinion describes, however, was in fact before the jury at sentencing.  Moore and his aunt each testified to the severe abuse and neglect that he endured, to his mother stabbing his father, and to his having grown up in numerous foster homes and institutions.  Further, Moore testified regarding his mother's alcoholism and his father's abusiveness.  He described watching his father hitting his mother so hard that his father broke his hand in three places.  Finally, he testified to his further experiences with abuse, neglect, and alcoholism in foster homes.  Reverend Wilson testified that he was familiar with Moore's background, and he testified to the effect that such a background can have on a person.

determine whether the Kentucky courts denied Moore a clearly established right.  *See Myers v. United States*, 198 F.3d 615, 618 (6th Cir. 1999) (habeas petitioner could rely on a new constitutional rule announced before his conviction became final); *Hardy v. Washington*, 922 F.2d 294, 296 (6th Cir. 1990) (conviction became final for habeas purposes when Kentucky Supreme Court denied petition for rehearing).

The Kentucky Supreme Court rejected Moore's claim because it concluded that he failed to show a constitutional violation, and, even assuming a constitutional violation, he failed to show any actual prejudice.  *Moore I*, 771 S.W.2d at 39-41.

We agree with the Kentucky court that Moore has failed to show a Sixth Amendment violation.  Moore correctly points out that the Kentucky court erroneously required him to show prejudice—a requirement *Perry* explicitly rejected.  488 U.S. at 278.  But the Supreme Court also held in *Perry* that a defendant has no right to discuss his testimony with counsel during a short recess in the middle of that testimony.  488 U.S. at 280-84.  Thus the Kentucky court's conclusion that the recess here did not violate Moore's Sixth Amendment rights was not unreasonable, and Moore's claim fails.

## V.  Impartial Jury

Moore next contends that the trial court denied his right to an impartial jury at sentencing by using the same jury that convicted him.  Moore argues that the jury heard prejudicial evidence during the guilt phase—in particular, testimony of a defense witness suggesting that a previous jury had convicted Moore and sentenced him to death—and therefore he deserved a new jury for the penalty phase.

On direct appeal, the Kentucky Supreme Court rejected this argument, concluding that Moore himself presented much of the harmful evidence during the guilt phase, and that the harmful evidence "did not rise to [a] degree of pervasiveness" so as to establish prejudice and thus require a new jury for sentencing.  *Moore I*, 771 S.W.2d at 37.  Moore argues that the Kentucky court's decision constituted an unreasonable application of the clearly established law of two Supreme Court cases: *Patterson v. Colorado*, 205 U.S. 454 (1907), and *Leonard v. United States*, 378 U.S. 544 (1964).  But because neither *Patterson* nor *Leonard* clearly establishes any law relevant to Moore's claim, this argument fails.

*Patterson,* which concerned a court's ability to issue a contempt order against an individual for publishing articles and cartoons criticizing the state supreme court, presents no law bearing on Moore's claim.

*Leonard* is likewise inapposite.  It involved a situation in which prospective jury members sat in a courtroom and saw a jury announce a guilty verdict against the defendant.  The government then tried the defendant for a second crime, impaneling some of those who were present during the first verdict.  The Court held—and the government conceded—that the second jury should have been disqualified.  *Leonard*, 378 U.S. at 544-45.  Moore argues that *Leonard* is clearly established law that a jury possessing knowledge of a defendant's guilt must be disqualified from sentencing.  But the *Leonard* Court limited that decision to its facts.  *Id.* at 545 (disqualifying the jurors only "under the circumstances of this case").  Because Moore's situation is factually distinguishable, *Leonard* cannot serve as relevant clearly established law.  The Supreme Court has certainly not clearly established that bifurcated trials are generally required in the United States, even in capital cases.  And in the absence of any clearly established law, courts deny habeas relief.  *See, e.g.*, *Bugh v. Mitchell*, 329 F.3d 496, 513 (6th Cir. 2003) ("[T]here is no Supreme Court precedent that the trial court's decision could be deemed 'contrary to,' under AEDPA.").

## VI.  Cumulative Errors

Moore claims he is entitled to relief because of cumulative trial errors.  But we have held that, post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief.  *See Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002); *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002) (death-penalty decision stating, "The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief.").

Moore cites *Walker v. Engle* for the proposition that cumulative evidentiary errors can warrant habeas relief.  703 F.2d 959, 963 (6th Cir. 1983).  But *Walker* is pre-AEDPA, and is not Supreme Court precedent, as AEDPA requires.  *See Lorraine*, 291 F.3d at 447 (noting *Walker* was pre-AEDPA and refusing to consider errors cumulatively).  Because Moore can cite no Supreme Court precedent obligating the state court to consider the alleged trial errors cumulatively, we cannot grant relief on this ground.[4]

And even if we could consider the alleged errors cumulatively, Moore's claim would fail. We already denied a certificate of appealability for two of the alleged errors: restriction on cross-examination of prosecution witnesses, and failure to instruct the jury on second-degree manslaughter.  And we have above addressed and rejected Moore's arguments regarding the other two alleged trial errors: restricted contact between Moore and counsel during a lunch recess and use of the same jury for the trial's guilt and penalty phases.  Thus the alleged errors, considered individually or cumulatively, cannot support relief.

## VII.  Conclusion

For the foregoing reasons, we affirm the district court's denial of the writ of habeas corpus.

---

[4]Two of this court's unpublished post-AEDPA decisions state, in dicta, that the court may consider cumulative error in capital cases.  *See Davis v. Burt*, 100 Fed. Appx. 340, 351 n.1 (6th Cir. 2004); *Eskridge v. Konteh*, 88 Fed. Appx. 831, 836 n.1 (6th Cir. 2004).  But these cases directly contradict our binding *Lorraine* precedent, and we expressly repudiate them today.

———————————

**DISSENT**

———————————

BOYCE F. MARTIN, JR., Circuit Judge, dissenting. In this death penalty case, Brian Keith Moore's attorneys performed reasonably at trial. These same attorneys, however, failed their client at sentencing. If the Majority is correct and this kind of lawyering is "not even deficient performance, let alone prejudicial," Maj. Op. at 4, the legal profession ought to take a good look in the mirror. I believe Brian Keith Moore is entitled to a new sentencing hearing and I respectfully dissent.

**I.**

Moore asserts that several errors occurred during his trial and sentencing and asks this Court to vacate his conviction and/or sentence. Only one of his claims has any merit — that he received ineffective assistance of counsel by virtue of his attorneys' inadequate preparation for the penalty phase of his trial. Moore claims that his counsel "failed to devote an adequate amount of time toward preparing for the penalty phase, failed to make an in-depth investigation for background and mitigation evidence, and failed to employ testimony from a psychological expert." More specifically, Moore argues that his attorneys failed to discuss Moore's use of drugs in detail, failed to meet with his family members, failed to find approximately ninety-five letters submitted on his behalf during the first trial, and failed to obtain copies of school and mental health records. The most compelling aspect of Moore's claim is that after the mitigation psychologist retained by Moore's lawyers proved to be a fraud, counsel simply proceeded with the sentencing hearing without retaining another mitigation specialist to conduct the necessary mitigation investigation.

During the state habeas Rule 11.42 hearing, Moore presented substantial mitigation testimony that he asserted should have been presented at trial. In addition one of Moore's trial attorneys testified that only between 2-3% of his and co-counsel's time was spent preparing for the penalty phase of the trial. Both counsel testified that they were not aware that approximately ninety-five letters had been submitted on Moore's behalf in the first trial, and that they did not seek an expert to replace the psychological expert after discovering he was a fraud. Moreover, and most critically, Moore presented Lane Veltkamp, a licensed psychologist with a masters degree in clinical social work, to testify about Moore's background. Veltkamp conducted a clinical interview, interviewed family members, and reviewed mental health records, including Cabinet of Human Resource records regarding institutional placements, foster care placements and other information from Moore's childhood. Veltkamp opined that at the time of the crimes Moore had problems with "impulsiveness, poor judgment, behavior control, anger, and emotionally attaching to others." Veltkamp testified that these problems likely developed as a result of the severe neglect and physical abuse that occurred during Moore's childhood coupled with Moore's moving between approximately forty different living situations — including both foster homes and institutions. These problems were further exacerbated by Moore's drug and alcohol dependency. Specifically, Veltkamp testified:

> The neglect was so pervasive and so chronic partially because of his mother's alcohol problems, partially because his father was gone a great deal of time. I shouldn't refer to mother's problems as alcohol problems. She was a very severe alcoholic. *She abandoned the children for periods of time.* Even as preschoolers they were left alone periods of time.

Relatives would see the *children eating dog food*. Relatives were concerned that there were times when they were *eating asbestos* because there wasn't food in the house. There was deprivation of food, deprivation of nurturance [sic], deprivation of emotional support. We're not talking about something that's isolated or sporadic. This was a *chronic, pervasive environment* for the first seven years of Mr. Moore's life. In that environment was *very severe physical abuse . . . by his father*. Physical abuse of a mother by a father is viewed as *one of the most traumatic things that a child can experience*. It causes severe trauma to a child because a child can't control it, can't stop it, can't prevent it. His abuse was so severe that on *one occasion his father was hitting his mother to the point that he broke his own hand in attempting to hurt his mother*.

(Emphasis added). Moreover, Moore spent most of his life moving to numerous different foster homes. Veltkamp testified that:

One or two or three moves is considered a small number of moves and would not necessarily impair the child. But when you're approaching 20, 30, 40 moves - *we think there's as many as 30 moves in Brian's first 15 to 17 years*. It just has a severe impact, psychological impact on the child . . . This abusiveness [directed toward Moore] not only occurred in his own family and was very severe and occurred the first seven years of his life, but then he's placed in a *foster home where there's continued neglect and alcoholism*. He has multiple placements after that and he's subjected to *additional incidences of neglect and abuse*. So this problem continues and the longer the duration of these kinds of events, the more severe the events are. *Mother cutting up father. Father battering mother to the point that he broke his own arm*. These are so pervasive and so chronic and occurred so many times and over such a long period of time that *the risk of a child exposed to those kinds of behaviors is very, very high*.

(Emphasis added).

        The district court did not reach the question of whether counsel's decision not to present a mitigation expert was reasonable. Instead, the court disposed of the claim by finding no prejudice — that is, the district court concluded that Veltkamp's testimony was just as likely to underscore Moore's dangerousness as it was to engender sympathy for him, and therefore a reasonable probability did not exist that Moore's life would have been spared by the jury. The Majority here agrees.

        Before turning to the legal analysis, and especially because the Majority finds this case so different from the cases where we have found ineffective assistance at sentencing, I think it is appropriate to review the actual sentencing transcript. The district court found that counsel "provided jurors with a general description of Moore's difficult childhood through testimony from Florine Shoptaw, Melanie Shoptaw, and Moore. Through testimony from Florine Shoptaw, Melanie Shoptaw, Father Patrick Delahanty, Reverend George Wilson, Helen Pratt, Joe Koenig, and Mr. Moore himself, [counsel] presented evidence of Moore's human side, his desire to improve himself, and his potential for rehabilitation through long-term incarceration." Dist. Ct. Op. at 35.

After my review of the record, I would characterize the proceedings differently. Counsel did make an opening statement at the sentencing hearing that Moore "was abandoned by his mother and father and raised in various foster homes; that Brian Keith Moore can be rehabilitated; that he is loved by people such as his aunt and his cousin, even if he has not been treated well and given the attention in the early years by his natural mother and father."

The first witness to testify on Moore's behalf was his aunt, Florine Shoptaw. Florine testified that during Moore's "very early childhood, he was in a home, my sister's home, and it was — there was a lot of violence there." She continued, "I can't say that I saw any of the violence . . ." But, she did testify that she saw signs of violence and knew that her sister had been jailed for stabbing her husband, though she hadn't seen her sister between 1965 and 1978. Florine also testified that Moore had received "none or negligible" support from his father, that Moore had lived with his grandparents for a period of time, and that visiting him during the past few years on death row led her to believe that he had "matured" and there was a "marked improvement even in his vocabulary."

Following Florine to the stand was her daughter and Moore's cousin, Melanie Shoptaw. Her testimony barely covers five transcript pages. She testified that she believed Moore was innocent and that he was going to the prison library "just trying to better himself with that and know what was going on."

The next to testify was the Reverend Patrick Delahanty, whose only relevance it appears was that he was a reverend and had a college degree in philosophy. He had one conversation with Moore and testified regarding the content. Counsel asked whether, "[b]ased on your conversation with Brian Keith Moore, do you feel that he has the potential to be rehabilitated?" Reverend Delahanty replied, "Yes, I do." He also testified that it was his belief that Moore was trying to make the best of a bad situation and that Moore had made the decision to turn his life around.

Following Reverend Delahanty, the deposition of Reverend George M. Wilson was read to the jury. Wilson also appears not to have had any personal relationship with Moore or any knowledge about his background. Instead, Reverend Wilson testified generally about socio-economics, ethics, and morality, and, both ironically and perceptibly, that poor people have a hard time getting good lawyers in this country. He also testified that alcohol is a depressant and that if Moore was drunk at the time of the crime, "it should be taken seriously."

Moore testified next. He rather cursorily reiterated the story that his mother had once been incarcerated for stabbing his father. He also testified that he was aware that his parents had hit one another and that he had been placed in foster homes and the Northern Kentucky Reception Center for running away from a foster home. Moore's testimony was not lengthy and was rather perfunctory, though he was, without a doubt, the only witness who truly said anything of substance.

After Moore's testimony, the jury heard from Helen Marie Pratt, who served as Moore's "boss" in prison and testified that he was a janitor and she had not had any problems with his work. Finally, Moore's mitigation case concluded with the testimony of Prison Chaplain Joe Paul Koenig, who testified that he had seen Moore become more positive during his incarceration and that he believed Moore could adapt to the prison setting.

When one reviews the actual sentencing transcript it becomes clear that Moore's attorneys were simply grasping at straws. They need not have. By merely following through on their initial decision to have a mitigation expert or mental health professional interview Moore and conduct an investigation, Moore's attorneys would have had plenty of compelling testimony to present and would not have had to rely on rather weak testimony from people with only a tenuous connection to Moore's life.

**II.**

*Strickland v. Washington*, 466 U.S. 668 (1984), *Wiggins v. Smith*, 539 U.S. 510 (2003), and common sense control this case. To prevail, Moore must satisfy both the performance and prejudice prongs of *Strickland*, in that he must demonstrate that counsel's performance fell below an objective standard of reasonableness, and then, but for counsel's deficiencies, there is a reasonable probability that the outcome of his sentencing would have been different. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687; *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005).

The district court disposed of Moore's claim by first determining that Moore failed to demonstrate prejudice. The court reasoned that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Dist. Ct. Op. at 38 (quoting *Strickland*, 466 U.S. at 697). Consequently, the district court assumed deficient performance and assumed that had trial counsel called a mitigation or mental health expert, that testimony would have been similar to the testimony offered by Dr. Veltkamp at the state habeas hearing. Conceding that the "evidence demonstrates that an in-depth investigation and psychological expert would have revealed *a more graphic description of Moore's atrocious childhood*," *id.* at 40 (emphasis added), the district court nonetheless concluded that testimony that Moore "had problems with impulsiveness, poor judgment, behavior control, anger, and emotionally attaching to others" also "underscores Moore's dangerousness" and therefore a reasonable probability that the jury would have spared his life did not exist, *id.* at 39.

A.

This case, like both *Wiggins* and *Strickland*, involves counsel's decision (or more realistically, oversight and inattention) to limit the scope of the investigation into potential mitigation evidence. *Wiggins*, 539 U.S. at 521. In *Wiggins*, the Supreme Court reaffirmed the principles outlined in *Strickland*, reiterating that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* Because these cases result from a failure to investigate mitigation evidence, the Supreme Court phrased the question as "not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence [of the defendant's] background *was itself reasonable*." *Id.* at 523 (emphasis in original). We ordinarily review claims of ineffective assistance of counsel with hefty deference to the fully-informed strategic decisions made by counsel. When counsel is not fully-informed or makes no effort to become so, the traditional deference has not been earned. The critical question here is, therefore, whether the investigation supporting counsel's decision not to retain or introduce a mitigation specialist was itself reasonable. In this case, there was no investigation supporting counsel's decision not to retain a mitigation specialist. Moreover, a strategic decision this was not. Counsel just failed to retain a necessary expert,[1] making a fully-informed decision about what evidence to present impossible.

The Supreme Court has made clear that the "ABA standards for counsel in death penalty cases provide the guiding rules and standards to be used in defining the 'prevailing professional norms' in ineffective assistance cases." *Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2004) (quoting *Wiggins*, 539 U.S. at 524). Those standards provide that investigations into mitigating evidence "should comprise efforts to discover *all* reasonably available mitigation evidence," which

---

[1]While mitigation evidence need not always be presented at a sentencing hearing, once counsel chooses to pursue a mitigation strategy, it is entirely unreasonable not to conduct a complete investigation or to retain a mitigation expert who does so.

should include investigation into "*medical history*, educational history, employment and training history, *family and social history*, *prior adult and juvenile correctional experience*, and religious and cultural influences." *Wiggins*, 539 U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.8.6 (1989) (emphases added)). The Majority here fails to explain adequately, let alone at all, how counsel's "decisions,"[2] were consistent with prevailing professional norms. The reason, I suspect, is because counsel's performance did not meet that standard.

Counsel was sufficiently competent to initially recognize the value of a mitigation psychologist as an expert witness at sentencing. Prior to the penalty phase, however, the expert retained, "Dr." Bresler, was exposed as a fraud. Counsel appropriately declined to call Bresler. *See also Skaggs v. Parker*, 235 F.3d 261 (6th Cir. 2000), *cert. denied*, 534 U.S. 943 (2001) (holding that similarly situated defense counsel acted objectively unreasonably by using Bresler in mitigation). Instead of then retaining another psychological expert, counsel inexplicably proceeded without any mental health professional to evaluate Moore.[3] There is zero evidence that counsel made a conscious "decision" to proceed without another mitigation specialist — rather, the record indicates that counsel proceeded without any intelligible or cohesive strategy. Like *Wiggins*, "counsel uncovered no evidence in their investigation to suggest that a mitigation case, in its own right, would have been counterproductive, or that further investigation would have been fruitless." *Wiggins*, 539 U.S. at 524.

The importance of a mitigation or mental health specialist at sentencing cannot be overstated. A psychologist and other types of mitigation specialists "gather facts, through professional examination, interviews, and elsewhere, that they will share with the judge or jury." *Ake v. Oklahoma*, 470 U.S. 68, 80 (1985). Mitigation specialists investigate a defendant's social background, including personal, familial, school, and other records that can bear upon moral culpability. They interview persons who could possibly have information relevant to the mitigation case. Mental health specialists can identify disorders and medical conditions and explain them in lay terms to the jury. Mitigation specialists know the questions to ask and the avenues of investigation to pursue relevant to presenting a case designed to spare the defendant's life. Mitigation specialists are qualitatively different from lay witnesses and can translate complex information into testimony that will assist the jury in reaching its determination. Mitigation specialists, when counsel decides to present a mitigation defense at sentencing, are nothing short of essential.

This Court has emphasized the critical importance of counsel's use of a mental health expert at the mitigation phase of a capital trial. In *Hill v. Mitchell*, 400 F.3d 308 (6th Cir. 2005), this Court

---

[2]*See*, *e.g.*, *United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989) ("counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made."). Counsel not only did not pursue this avenue of mitigation evidence but simply failed to make any reasoned decision not to. *See Blackburn v. Foltz*, 828 F.2d 1177, 1183 (6th Cir. 1987) ("Counsel did not make any attempt to investigate this known lead, nor did he even make a reasoned professional judgment that for some reason investigation was not necessary.").

[3]The Majority opinion seems to imply that Moore was interviewed by a psychologist at the time of his sentencing hearing. The Majority writes that "Moore cannot show prejudice here. He does not dispute that his attorneys researched his background and presented seven witnesses [which, as discussed, I dispute] who testified regarding his childhood at his sentencing hearing. *Another psychologist did interview Moore for three to four hours, and testified that Moore had various problems that began to emerge during childhood . . .*" Maj. Op. at 4 (emphasis added). This seems to imply that Moore was evaluated by a psychologist in preparation for his sentencing hearing and that a psychologist testified at his sentencing hearing, which is not true. Rather, the only psychologist to interview Moore was Mr. Veltkamp who interviewed Moore many years later in preparation for state post-conviction proceedings. After the psychologist that Moore's trial counsel retained was exposed as a fraud, they did not retain another psychologist to interview him, and presented a hollow mitigation case.

rejected the defendant's claim that he received ineffective assistance of counsel. There, a mitigation psychologist was not retained until the day before the mitigation hearing. *Id.* at 311. This Court rejected the defendant's argument that the delay in retaining the expert constituted ineffective assistance of counsel "because the mitigation theory that the psychologist did present . . . did not differ in material ways from the one that would have been presented with more preparation" and also "because nine psychological and background assessments of Hill had already been undertaken by the time the mitigation psychologist was hired and all of them were submitted to the jury during the sentencing hearing." *Id.* In reaching its conclusion, this Court noted that "this is not a case in which expert psychologists did not have an opportunity to examine Hill until the eleventh hour." *Id.* at 315. Numerous psychologists examined Hill for competency prior to trial and again during trial. *Id.* In fact, "during the penalty phase and mitigation hearing, Hill's attorneys introduced into evidence *nine reports* examining his mental health." *Id.* (emphasis added). The Court further emphasized the differences between Hill's case and cases warranting habeas relief:

> In contrast to cases involving a complete failure to investigate or a *complete failure to put on any mitigation specialist*, the question here is whether the late hiring of a mitigation specialist had a reasonable likelihood of altering the jury's verdict, particularly when all of the post-conviction-hearing affidavits already relate in one way or another to the mitigation evidence that Hill's attorneys did present.

*Id.* at 318 (emphasis added). This Court therefore has already explicitly recognized that a complete failure to put on any mitigation specialist is ordinarily deficient performance by counsel.[4]

Likewise, this Court's recent decision in *Harries v. Bell*, 417 F.3d 631 (6th Cir. 2005), demonstrates the importance of retaining a mental health or mitigating expert. In *Harries*, the Court found deficient performance on a failure to investigate claim at sentencing even though counsel had interviewed the defendant's mother and brother, had sent requests for information to various institutions at which the defendant had previously been confined, and interviewed Harries co-defendant and two state witnesses. *Id.* In addition counsel had requested two court-ordered competency evaluations. *Id.* Nonetheless, this Court held that counsel's performance was deficient because "they declined to seek the assistance of a mental health expert or conduct a thorough investigation of Harries's mental health, even after Harries's mother alerted them that Harries suffered from mental illness. Nor did counsel adequately investigate Harries's family background, *despite indications of Harries's troubled childhood*." *Id.* at 638 (emphasis added). How Moore's case regarding evaluating the performance of counsel is any different is not clear to me.

The Supreme Court generally has eschewed — though less vigorously as of late — bright line rules for defense counsel. I would hope that we had reached a point where, having recognized the necessity of mitigation specialists in capital cases, we could further agree that when counsel chooses to go the mitigation route, "prevailing professional norms" *require* counsel to retain a mitigation specialist. This is not to say that counsel is *required* to actually present the testimony of a mitigation specialist in all cases. Possibly, after some — though likely few — investigations into a capital defendant's background, there will be reasonable strategic considerations that weigh against presenting the specialist. In light of the American Bar Association Standards, the fact that most capital defendants come from troubled backgrounds, and decades of experience, it is unfathomable to me, however, that counsel in any capital case would fail in the first instance to even retain a mitigation specialist to investigate. That this Court puts its imprimatur on this kind of lawyering is even more troubling.

---

[4]Likewise, other courts have recognized that "it is probably true that defense counsel in a capital case should routinely have their client evaluated by a mental-health professional." *Jones v. Delo*, 258 F.3d 893, 902 (8th Cir. 2001), *cert. denied*, 535 U.S. 1066 (2002).

Notwithstanding the critical importance of a mitigation specialist, the Majority concludes that counsel's performance at the penalty stage was not as egregious as in some other cases where counsel presented *no* mitigation evidence, *see*, *e.g.*, *Hamblin*, 352 F.3d 482, and therefore rejects Moore's claim. The Majority fails, however, to explain why it draws this distinction and why this distinction is sufficient to end the inquiry. We have never held that counsel is ineffective only when *wholly* failing to investigate or present any mitigation evidence and our case law belies such a conclusion. *See Towns*, 395 F.3d at 258 ("Courts have not hesitated to find ineffective assistance . . . when counsel fails to conduct a reasonable investigation into *one or more* aspects of the case."). *Some* investigation does not equal a *reasonable* investigation. *Some* evidence does not equal *effective* assistance. Counsel who presents mitigation evidence of one type — perhaps of a defendant's capacity for rehabilitation — but who unreasonably and for no strategic reason omits powerful and compelling mitigation evidence of social history or mental illness is still constitutionally ineffective. *See e.g.*, *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) (noting that in order to establish prejudice, a habeas petitioner must introduce evidence that differs in strength and subject matter from evidence presented at trial). I fail to see why the Majority concludes its inquiry merely because counsel presented some mitigation evidence (of dubious relevance). Moreover, presenting *some* mitigating evidence is not the same as presenting *meaningful* mitigating evidence.

Furthermore, the Majority mischaracterizes the facts of *Wiggins*. *Wiggins* was not a case, as the Majority claims, where counsel completely failed to make any investigation into mitigating evidence. The Maryland Court of Appeals noted that counsel had obtained "detailed social service records that recorded incidences of physical and sexual abuse, an alcoholic mother, placements in foster care, and borderline retardation." *Wiggins v. State*, 352 Md. 580, 608-609 (1999). Further, the Court of Appeals emphasized that "counsel *did* investigate and *were* aware of appellant's background." *Id.* at 610 (emphases in original). Further, the Fourth Circuit in *Wiggins*, as the Majority does here, drew a distinction between cases where counsel wholly failed to investigate, such as *Williams v. Taylor*, and cases, such as Wiggins's where counsel "knew at least some details of Wiggins'[s] childhood from the PSI and social services records." *Wiggins*, 539 U.S. at 519 (citing *Wiggins v. Corcoran*, 288 F.3d 629, 639-40 (4th Cir. 2002)). The Supreme Court recognized as much, but still found counsel's investigation deficient. According to the Supreme Court, "the scope of [counsel's] investigation was also unreasonable in light of what counsel actually discovered in the DSS records. The records revealed several facts: Petitioner's mother was a chronic alcoholic; Wiggins was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for days without food." *Id.* at 525. Thus, Wiggins's counsel, like Moore's counsel here, had some highly relevant, though limited, knowledge of the atrocious childhood their client endured. In both cases, however, counsel failed to investigate further when a reasonable attorney would have pursued the leads identified. *Id.*

Moreover, counsel was aware generally of Moore's troubled childhood. This general knowledge, as in *Wiggins*, heightened counsel's responsibility to investigate further so as to competently choose among evidence to present. *Wiggins*, 539 U.S. at 525. In light of counsel's brief knowledge of Moore's background, which indicated a troubled childhood, "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Id.* at 527-28. While counsel did present some mitigation evidence, "[c]ourts have not hesitated to find ineffective assistance in violation of the Sixth Amendment when counsel fails to conduct a reasonable investigation into *one or more* aspects of the case." *Towns*, 395 F.3d at 258. When counsel chooses to present a mitigation defense complete with the testimony of a mental health expert, but for reasons wholly unrelated to the need for the expert or strength of the mitigation case, becomes unable to use that particular expert, it is

particularly deficient performance when for no strategic reason counsel simply fails to retrain another expert to conduct the background investigation.[5]

In this case, it is true that counsel presented seven witnesses, including Moore himself. It is *not* true that Moore "presented four witnesses who testified regarding his childhood at his sentencing hearing." Maj. Op. at 4. Rather, as the previous section demonstrates, only Moore himself and his aunt Florine even mentioned his childhood, and Florine's testimony was largely hearsay or speculation. The others who testified were his cousin who said nothing relevant, three clergy members, and a prison worker. The fact that these witnesses were presented does not justify an inadequate investigation and failure to present a mitigation specialist in light of what was ultimately learned and presented by Veltkamp.

Furthermore, in *Skaggs v. Parker*, 235 F.3d 261 (6th Cir. 2000), this Court found ineffective assistance of counsel when trial counsel used an incompetent and fraudulent mitigation "expert" at sentencing. There, Bresler, the same fraudulent "expert" at issue here, was used by the defense at trial and testified comically and irrationally. Nonetheless, counsel chose to use Bresler again at sentencing. *Id.* at 273-74. The Court found, therefore, that counsel's "failure to investigate and present meaningful mitigating evidence, and their decision to use an incompetent and fraudulent 'psychologist' as the central mitigation witness [] rendered counsel constitutionally ineffective." *Id.* at 267. I fail to see why counsel in Moore's case was any less deficient by realizing it unwise to go forward and use Brelser, but instead of retaining another expert, simply failing to retain *any* mitigation specialist, for no strategic reason whatsoever. Our Court's decision in *Skaggs* reflects the conclusion that using a fraudulent mitigation expert is tantamount to using *no* mitigation expert — which results in a finding of deficient performance. The Majority's conclusion in this case, therefore, is in conflict with our previous decision in *Skaggs* and *Hill*.

Finally, the fact that counsel simply failed to retain another expert "underscores the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Wiggins*, 539 U.S. at 526. I would hold that counsel performed a constitutionally deficient investigation into mitigating evidence by failing to retain a mitigation specialist.

B.

The inquiry, however, still requires a determination as to whether counsel's deficient performance prejudiced the defendant. The mitigation evidence in this case is powerful. The key testimony at Moore's Rule 11.42 hearing was from Lane Veltkamp, a licensed psychologist with a masters degree in social work. Veltkamp conducted a standard psychological evaluation and investigation into Moore's background. Veltkamp testified to the severe neglect and physical abuse that Moore endured, nearly forty moves to foster homes and institutions, an alcoholic mother and abusive father, and more. Moore and his siblings were left home alone for extended periods of time, and relatives observed the children eating dog food and asbestos because there was no food in the house. Moore observed his father physically abusing his mother, one time so ruthlessly that Moore's father broke his hand from hitting his mother so many times. He also observed his mother attempt to stab, slash and cut his father. Because of this abuse, Moore moved in between foster homes and institutions up to forty times, where the abuse, neglect, and alcoholism continued. Even the district court conceded that the mitigation "*evidence demonstrates that an in-depth investigation and*

---

[5] In addition, counsel failed to meet with family members, failed to find approximately ninety-five letters submitted on Moore's behalf in his first trial, and more importantly, failed to obtain copies of school and mental health records. These additional failures to investigate Moore's background demonstrate the inadequacy of counsel's mitigation investigation.

*psychological expert would have revealed a more graphic description of Moore's atrocious childhood*." Dist. Ct. Op. at 40 (emphasis added).

Moore's story, in fact, is quite similar to Wiggins's. As previously noted, Wiggins's "mother was a chronic alcoholic; Wiggins was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for days without food." *Wiggins*, 539 U.S. at 525. The mitigation investigation revealed that Moore was left alone on *more* than one occasion for days without food. It revealed that he was abused and witnessed his parents abusing and nearly killing one another. It revealed approximately twenty more moves between foster homes and institutions than Wiggins. There are aspects of Wiggins's background that surely are worse — he was both molested and raped repeatedly. *Id.* at 535. Nonetheless, the absence of sexual abuse in Moore's background does not diminish the "excruciating life history" he experienced. *Id.* at 537.

Furthermore, the aggravating factors in Moore's history are not as severe as those at issue in *Williams v. Taylor*, 529 U.S. 362 (2000), where the Supreme Court found deficient performance and prejudice. As the Chief Justice wrote in his dissent, Williams had savagely beaten an elderly woman, stolen two cars, set fire to a house, stabbed a man during another robbery, confessed to choking two inmates and breaking a fellow prisoner's jaw. *Id.* at 418. Here, as in *Wiggins*, "the mitigating evidence in this case is stronger, and the State's evidence in support of the death penalty far weaker, than in *Williams*, where [the Supreme Court] found prejudice as the result of counsel's failure to investigate and present mitigating evidence." *Wiggins*, 539 U.S. at 537-38.

The district court ruled that Moore was not prejudiced by counsel's failure to present a psychological expert at trial. The court believed that any psychological testimony that would have been presented at trial would have been similar to that given at the Rule 11.42 hearing. In addition to testifying regarding Moore's horrible childhood, Veltkamp testified that Moore was impulsive, had poor judgment and behavior control, and problems with anger and emotionally attaching to others. Based on these traits, the district court concluded that the testimony underscored Moore's dangerousness, and therefore he suffered no prejudice by the failure to present it at trial. I disagree. These traits attributed to Moore were cast by Veltkamp as the *result* of Moore's troubled background. "Evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." *Wiggins*, 539 U.S. at 535 (quoting *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)).

Given the great weight of mitigation evidence in Moore's background, I would hold that there is a reasonable probability that a competent attorney would have introduced the evidence at sentencing. *See Wiggins*, 539 U.S. at 535. Had the jury been confronted with the considerable mitigating evidence, as well as the evidence cited by the district court regarding Moore's behavioral problems, there is a reasonable probability the jury would have returned a different sentence. I would therefore hold that based on the totality of the evidence "both adduced at trial, and the evidence adduced in the habeas proceeding[s]," *Id.* at 536 (quoting *Williams*, 529 U.S. at 397-98), that there is a reasonable probability that the jury would have spared Moore's life.

The Majority here holds that Moore suffered no prejudice because Veltkamp's testimony was just as likely to impact Moore negatively as it was to engender sympathy for him. According to the Majority opinion, introducing testimony about the information Veltkamp uncovered "would likely have made him look even worse to the jury." Maj. Op. at 4. This so-called negative testimony consists, in its entirety, of Veltkamp's statements that Moore had problems with "impulsiveness, poor judgment, behavior control, anger, and emotionally attaching to others." The Majority's decision that this testimony entirely counteracts the immense weight of the mitigation evidence

proves just how truly malleable the prejudice inquiry can be.[6]  In any event, this Court recently stated in *Harries* that "[i]t is possible, of course, that a jury could have heard the evidence described above, and still have decided on the death penalty, but, as the Supreme Court noted in *Rompilla*, *that is not the appropriate test*.  Instead, we must ask whether the available mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of Harries culpability." *Harries*, 417 F.3d at 640 (citations and quotation marks omitted and emphasis added).  A reasonable probability does not require a virtual certainty of a different result. *See Rompilla v. Beard*, 125 S.Ct. 2456, 2469 (2005) ("although we suppose it is possible that a jury could have heard [the mitigation evidence] and still have decided on the death penalty, that is not the test...the likelihood of a different result if the evidence had gone in is 'sufficient to undermine confidence in the outcome' actually reached at sentencing").

In my opinion there is far more mitigating evidence here than is necessary to undermine confidence in the outcome of the sentencing hearing.  This type of childhood is all too common in criminal defendants, but not common enough, I hope, for a jury not to be reasonably influenced by it.  For Moore to prevail, we need not conclude that the unheard mitigating testimony would have beyond a reasonable doubt resulted in a different outcome.  In fact, we need not even be convinced that the jury would ultimately reach a different outcome.  All that we must be convinced of is that there is a *reasonable probability* that the jury would reach a different conclusion.  I believe Moore has satisfied this standard.

By reaching the opposite conclusion, I think the Majority's analysis lacks the proper perspective and reads too much into the so-called negative testimony from Veltkamp.  By the time of the penalty phase, it is clear, I think, that the jury had already convicted Moore of murder.  Not only had the jurors already convicted Moore of murder, but, due to some prior testimony, they knew that a previous jury had convicted Moore of the same crime.  It would not be a stretch therefore, to assume that the jury might have already begun to suspect that Moore had some anger management issues.  Hearing the term "poor judgment" to describe Moore would not likely have left the jury flummoxed.  Rather, hearing about a childhood such as Moore's would, I hope, have more of an effect on a jury than hearing that a convicted murderer has exercised some poor judgment.

Once again, the information that the jury never heard testimony about consisted of a graphic description of Moore's atrocious childhood.  Moore was repeatedly abused, abandoned, malnourished, forced to eat dog food to survive, witness to his mother and father nearly killing each other through domestic violence, and he continued to be abused while living in upwards of thirty to forty foster homes by the age of eighteen.  On the other hand, there is testimony that as a result of these childhood traumas, Moore has problems with anger and poor judgment.  Moore is entitled to have a new sentencing jury hear all of this information before reaching a decision on whether the State of Kentucky executes Moore.

Finally, in making this determination, I would find that the Supreme Court of Kentucky unreasonably applied *Strickland* and *Wiggins* to the facts of Moore's case and the requirements for habeas relief established by 28 U.S.C. § 2254(d) are therefore satisfied.  Because I would grant the writ of habeas corpus and order a new sentencing hearing, I respectfully dissent.

---

[6]The Majority does not indicate, nor has the Supreme Court, exactly what we are to consider in undertaking the prejudice inquiry.  Do we consider that juries are imposing the death penalty less and less?  Do we consider that Moore's crime, while violent and reprehensible, is really not the type of murder that a defendant often gets sentenced to death for, either in Kentucky or across the United States.  Do we consider the vast number of murders that occurred in Kentucky before and since Moore's crime where the defendant was not sentenced to death?  Do we consider what other juries tend to do when confronted with the type of mitigating information that Moore's attorneys failed to present?  It seems to me that if the answer to any of these questions is yes, the great weight of evidence leans in favor of a finding of prejudice.

                                        *          *          *

       I have been a judge on this Court for more than twenty-five years.  In that time I have seen many death penalty cases and I have applied the law as instructed by the Supreme Court and I will continue to do so for as long as I remain on this Court.  This my oath requires.  After all these years, however, only one conclusion is possible: the death penalty in this country is arbitrary, biased, and so fundamentally flawed at its very core that it is beyond repair.

       The flaws are numerous and the commentators have documented them well.  There have been numerous death row exonerations.  In fact, in some states the pace of exonerations competes with the pace of executions.  *See e.g.*, Death Penalty Information Center Searchable Database, http://www.deathpenaltyinfo.org/executions.php, last accessed September 6, 2005 (indicating that since 2000, Louisiana has executed two individuals while five individuals have been exonerated from death row).  Blatant racial prejudice continues to infest the system.  *See, e.g. Miller-El v. Dretke*, 125 S. Ct. 2317 (2005).  Peremptory challenges tilt the balance from the outset in favor of death.  *Id.* at 2340 (Breyer, J., concurring).  The election of state judges creates another subtle bias toward death.  Justice John Paul Stevens, *Address to the American Bar Association Thurgood Marshall Awards Dinner Honoring Abner Mikva* (Aug. 6, 2005), available at http://www.supremecourtus.gov/publicinfo/speeches/sp_08-06-05.html. Crime labs are unreliable, *see* Ralph Blumenthal, *Officials Ignore Houston Lab's Troubles, Report Finds*, N.Y. TIMES, A10 (July 1, 2005); The Innocence Project, DNA News, http://www.innocenceproject.org/dnanews/index.php (documenting suspension of DNA testing in Houston, Texas as a result of lab incompetence); *see also House v. Bell*, 386 F.3d 668 (6th Cir. 2004), *cert. granted* 125 S. Ct. 2991 (2005), witness identifications continue to prove faulty, and false testimony and false confessions plague the system, *see e.g.*, The Innocence Project, http://www.innocenceproject.org/case/display_profile.php?id=07 (case of Rolando Cruz).  The death penalty has proved to be an ineffective cure for society's ills, public support continues to erode, and we share the dubious distinction of being the only western democracy that continues to put its own citizens to death.  Of particular relevance to this case, the bad lawyering and incomprehensible arbitrariness that permeate the system should disgust any person concerned with the fair administration of criminal justice.  Many of these flaws are rightfully brought to the attention of the nation's political leaders.  Notwithstanding, many of these flaws are legally relevant to the Eighth Amendment question — namely, under "evolving standards of decency," *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) (plurality opinion), "whether people who were fully informed as to the purposes of the penalty and its liabilities would find the penalty shocking, unjust, and unacceptable." *Furman v. Georgia*, 408 U.S. 238, 360 (1972) (Marshall, J., concurring).

       An even better argument, in my opinion, is that the death penalty violates the Fourteenth Amendment because it is so transparently arbitrary that the system in its entirety fails to satisfy due process.  More than ten years have passed since Justice Blackmun's statements in *Callins v. Collins*, 510 U.S. 1141 (1994) (Blackmun, J., dissenting from denial of certiorari), regarding the failure of the death penalty system due to the absence of consistency, rationality, and fairness in its administration.  It has only gotten worse.  Justice Stevens's recent address to the American Bar Association thoughtfully makes the case that there are "special risks of unfairness" in the administration of the death penalty.  Justice John Paul Stevens, *Address to the American Bar Association Thurgood Marshall Awards Dinner Honoring Abner Mikva* (Aug. 6, 2005) ("[W]ith the benefit of DNA evidence, we have learned that a substantial number of death sentences have been imposed erroneously. That evidence is profoundly significant - not only because of its relevance to the debate about the wisdom of continuing to administer capital punishment, but also because it indicates that there must be serious flaws in our administration of criminal justice . . . My review of many trial records during recent years has, however, persuaded me that there are other features of death penalty litigation [aside from ineffective assistance of counsel] that create special risks of unfairness.").

As noted above, while the system suffers from many flaws, much of the arbitrary imposition of the death penalty stems from the exceedingly distressing fact that during all my years on the bench, the quality of lawyering that capital defendants receive has not substantially improved. In many cases it has deteriorated. In fact, one of the most clear examples of the arbitrariness of the death penalty is the common knowledge that those defendants with decent lawyers rarely get sentenced to death. Death has more to do with extra-judicial factors like race and socio-economic status than with whether death is deserved. A system, whose basic justification is the interest in retribution and general deterrence, is not served when guided by such irrelevant factors. Nor should a system of life and death hinge on the proficiency of counsel.

I have no delusions of grandeur and I know my place in the judiciary. My oath requires me to apply the law as interpreted by the Supreme Court of the United States. I will continue to do as I am told until the Supreme Court concludes that the death penalty cannot be administered in a constitutional manner or our legislatures abolish the penalty. But lest there be any doubt, the idea that the death penalty is fairly and rationally imposed in this country is a farce.