No. 05-1528
File Name: 07a0395n.06
Filed: June 14, 2007

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| Barbara Jean Cross, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Clarice Stovall, | ) | |
| | ) | **OPINION** |
| Respondent-Appellee. | ) | |
| _____ | ) | |

**Before: BATCHELDER and MOORE, Circuit Judges, and MILLS, District Judge.**[*]

**RICHARD MILLS, District Judge.**

## I. FACTS

A jury found Petitioner Barbara Jean Cross guilty of conspiracy to commit

murder, solicitation to commit murder, and first-degree premeditated murder, on

an aiding and abetting theory. *See Cross v. Yukins*, 2005 WL 675836, at *4. At

Cross's trial, the jury heard how Cross's former husband, Gary Roy, was shot to

_____

[*] The Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

death in his Gladwin County, Michigan home on October 15, 1999 by Gordon Dittmer. The prosecution theorized that Cross believed she would profit financially from his death by obtaining life insurance proceeds and succeeding to his interest in the former marital home and farm. Cross contended that John Benjamin ("Benjamin"), with whom she lived, hatched the scheme on his own, conspired with his brother Billy Joe Benjamin ("Billy Joe"), and hired Dittmer to carry out his plan so that he could benefit from the property Cross would inherit and simultaneously eliminate a competing love interest.

Cross's defense was compromised when Benjamin agreed to testify against her in exchange for second-degree murder charge and a sentence of twenty-five to fifty years in custody. Benjamin testified that he met Cross in August of 1999 shortly after his release from prison and began a sexual relationship with her. According to Benjamin, in late August Cross jested that she wished Roy was dead. Cross later said she really wanted Roy dead so she could collect life insurance money and obtain their former marital home.

At the end of September 1999, Cross conceived a plan to kill Roy, a truck driver who often traveled during the week. Under the plan, Benjamin would find Roy on a trucking run, murder him, and make the attack look like a robbery. Benjamin testified that while he had no intention of murdering Roy himself, he

2

followed him to the Chicago area at Cross's request. Cross encouraged Benjamin to kill Roy. On October 8, 1999, she drew a diagram of the cab of Roy's truck for Benjamin, explained where Roy slept in the truck, and advised Benjamin to shoot Roy in the head while he slept there. She gave him Roy's driving routes and Benjamin again left Michigan to search for Roy. Cross called Roy numerous times on October 9 and 10 to locate Roy for Benjamin. She then called Benjamin and said Roy intended to be at locations in Pennsylvania, Indiana, and Michigan. Benjamin testified he could not murder Roy himself, so he made up excuses for not completing the plan.

Because Benjamin did not want to kill Roy himself, and balked at Cross's new suggestion that he run Roy off the road and kill him, Benjamin proposed that Cross hire a prison friend of his, Gordon Dittmer, to shoot Roy. Cross agreed. She told Benjamin to offer Dittmer $100,000 for his services, payable from Roy's life insurance proceeds. Benjamin agreed to give Dittmer an advance payment of $500 and a used car.

Benjamin testified that on October 14, 1999, he drove to Dittmer's house in Lansing and Dittmer agreed to murder Roy pursuant to Cross's terms. Benjamin took Dittmer to a post office in Rhodes, Michigan the next day to meet Cross. Benjamin met with Cross and identified Dittmer as the "guy who was gonna do the

3

hit" that evening at Roy's house. Benjamin and Cross planned to get Cross's children and be away from the house that night in order to have alibis. In keeping with their alibis, they agreed to meet that afternoon, spend the night at the Sportsman's Bar, and stay the night at a motel in Pinconning under the pretense of celebrating the birthday of Cross's son, Ryan.

Benjamin picked up Dittmer on October 15, 1999, and left him at the Sportsman's Bar. Benjamin stole a rifle from a home and, with the help of his nephew Billy Joe, obtained bullets. Billy Joe test-fired the rifle twice, reloaded it, wiped his fingerprints from the gun, and hid it under his bed. Benjamin then went to meet Cross. Cross brought her two sons to meet with Benjamin around 4:00 p.m. She gave him a check for $620, and Benjamin cashed it to make a payment to Dittmer. Cross took Benjamin and her two sons to a motel room near the Sportsman's Bar and went inside the bar.

Benjamin testified that he and Dittmer left Cross at the bar. They began preparing for the murder by going to a store and buying galoshes, gloves, and a hat—items that Dittmer would wear when he shot Roy. They then went to Billy Joe's house and retrieved the rifle from Billy Joe. The three men left to case Roy's house. They discussed the best way to approach the house, where to park the car, how to shoot Roy, and how Dittmer should escape after the killing. Dittmer

4

brought Benjamin and Billy Joe to the bar and Benjamin gave him the advance payment. Benjamin asked Dittmer to give the others a couple of hours at the bar to establish their alibi before murdering Roy. Before Dittmer left in Benjamin's vehicle, Benjamin reminded Dittmer to make the shooting look like a robbery and told him where to hide the gun and clothes after the murder.

Dittmer went to Roy's house and shot and killed him. He stole some compact disks and jewelry from the house and stashed the rifle and the clothes he wore in a marsh. Dittmer went to the Sportsman's Bar and told Benjamin "it's done." He described the details of Roy's murder and then drove to Lansing in Benjamin's car. Cross left messages that night and the following Saturday morning on Roy's answering machine. On Sunday morning, Benjamin and Cross drove to a marsh to retrieve the items Dittmer hid. Cross and her sons returned home Sunday afternoon and discovered Roy's body. Cross called the police.

Billy Joe also testified for the prosecution. In exchange for a second-degree murder charge and maximum sentence of twelve to twenty years in prison, Billy Joe testified that on September 10, 1999, Benjamin told him that Cross wanted Roy dead so she could collect insurance money. Billy Joe said he heard Cross state at a party that she wished Roy was dead. He also testified to the events of Roy's murder, largely confirming Benjamin's testimony. Another witness,

5

Dorothy Ford testified that she lived with Cross between May and September 1999 and overheard Cross say that if Roy were dead it would "solve most of her problems."

Larry Tatro, the father of Cross's sons Ryan and Timothy, testified that Cross asked him several times over the years to murder Roy. He said that he and Cross talked about killing Roy while Roy was on the road and doing it in a way that would make Roy's murder seem like a botched robbery. While Tatro told his cousin John Monroe that Cross asked him to kill Roy, he admitted on cross-examination that Cross merely had mentioned killing Roy but had not asked him to do it. John Monroe testified over Cross's objection that he had spoken with Tatro some three to four months before Roy's murder and Tatro said Cross attempted to convince him to kill "her boyfriend or husband or whoever the gentleman was." Monroe also testified that at a funeral in 1998 or 1999, Cross told him she wished somebody would kill Roy.

Ryan Cross testified that his mother received a call from Benjamin shortly before Roy's murder and told Ryan that Benjamin had hired someone to murder Roy. During the weekend of Roy's murder, the family stayed at a motel and Cross gave Ryan and Timothy $80 to $100 each instead of the $10 to $30 they usually received for their birthdays. Ryan also testified that Cross and Benjamin gave

6

them beer, marijuana and cocaine on the night of Roy's murder. He said Cross told Ryan and Timothy that she had life insurance on Roy in case he died. After Roy's body was discovered, Cross asked her sons to "lie for her."

During Cross's trial, the parties learned that the spouse of juror Norbert Kortes had contact with a member of Roy's family. Roy's family member gave Kortes' wife newspaper articles about the case and Mrs. Kortes said she would share them with her husband. Upon discovering this, the trial judge conferred with the parties in his chambers and said that he would have Kortes removed from the jury or deal with the matter in some other way. The parties all agreed to simply remove Kortes.

During the trial, the prosecutor vouched for Benjamin, and opined that Cross was guilty. Defense counsel did not object to the prosecutor's comments. When it came time to instruct the jury, defense counsel did not seek a "mere presence" or "bad acts" instruction. Upon deliberation, the jury found Cross guilty on all charges.

Cross was sentenced to life without parole on the murder and conspiracy convictions and fifteen to fifty years on the solicitation count. *See Cross*, 2005 WL 675836, at *4. Her conviction was affirmed on appeal. *See People v. Cross,*

7

2003 WL 178802 (Mich.App. 2003). The Michigan Supreme Court denied her leave to appeal. *See People v. Cross,* 469 Mich. 863, 666 N.W.2d 669 (2003). Cross filed a 28 U.S.C. § 2254 habeas petition in the district court, but the district court denied relief. *See Cross v. Yukins*, 2005 WL 675836 at \*16.

Cross timely appealed. She argues that the district court should have granted her § 2254 petition because Kortes tainted the jury. She also claims her attorney was ineffective because he failed to ask for Kortes's removal, seek a "mere presence" jury instruction or request an instruction about "bad acts." She further claims that the evidence was insufficient for a conviction and cumulative effect of the foregoing "errors" make her convictions subject to collateral attack. The Court considers these issues in turn.

## II. JURISDICTION

This Court has jurisdiction over Cross's appeal pursuant to 28 U.S.C. § 1291.

## III. STANDARD OF REVIEW

In evaluating a petition for habeas corpus, the Court reviews the district court's legal conclusions *de novo* and its factual findings for clear error. *Harrison v. Motley,* 478 F.3d 750, 754 (6th Cir.2007)(citations omitted). Because Cross

filed her habeas petition in 2003, the Antiterrorism and Effective Death Penalty

Act of 1996 (the "AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996), applies.

*Id.* (citation omitted). The AEDPA allows a federal court to grant habeas relief if a

state court's decision:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

*Id.* (citing 28 U.S.C. §§ 2254(d)(1)-(2)).

The United States Supreme Court has explained that a state court decision is

"contrary to" federal law under the AEDPA standard "if the state court arrives at a

conclusion opposite to that reached by [the Supreme] Court on a question of law

or if the state court decides a case differently than [the Supreme] Court has on a set

of materially indistinguishable facts." *Id.* (citation omitted). A decision is an

"unreasonable application" of federal law if the state court "identifies the correct

governing legal principle from [the Supreme] Court's decisions but unreasonably

applies that principle to the facts of the prisoner's case." *Id.*

## IV. ANALYSIS

9

## A. Jury Taint

A constitutional duty of inquiry arises when "a trial court is presented with evidence that an extrinsic influence has reached the jury which has a reasonable potential for tainting that jury." *Nevers v. Killinger,* 169 F.3d 352, 373 (6th Cir.1999), *see also United States v. Rigsby,* 45 F.3d 120, 124-25 (6th Cir.1995)("When there is a credible allegation of extraneous influences, the court must investigate sufficiently to assure itself that constitutional rights of the criminal defendant have not been violated."). During Cross's trial, the parties received information that juror Norbert Kortes's wife had contact with a member of Roy's family. *See Cross*, 2005 WL 675836 at *7. The victim's family member gave Mrs. Kortes newspaper articles about the case and Mrs. Kortes said she would share them with Mr. Kortes. Cross, the attorneys, and the judge all met in chambers to discuss the matter. The following colloquy occurred:

> THE COURT: Okay. Well, we have selected 14 jurors in this particular situation, and I can have Mr. Kortes brought in, and we can question him about these matters, if you wish to do that; or I can deal with it some other way, if you wish to do it.
>
> Do you have any suggestions on how you wish to proceed?
>
> MR. MIENK [defense counsel]: I would move to stipulate that he just be removed from the jury panel.
>
> MR. EVANS [prosecution]: And I have no objection to the defendant's motion, and I would so stipulate.
>
> THE COURT: Okay. Ms. Cross, have you heard what has been set

forth here on the record?

MS. CROSS: Yes, I have.

THE COURT: And did you understand it?

MS CROSS: Yes, I did.

THE COURT: And you understand your attorney is moving to have this juror, Mr. Norbert Kortes, removed from the jury panel?

MS. CROSS: Yes.

THE COURT: And are you in agreement with that?

MS. CROSS: Highly.

THE COURT: Your answer is?

MS CROSS: Yes.

*Id.* at \*7-\*8.

Pursuant to the Court's instruction, Mr. Kortes then went into the jury room and, without speaking to any juror, got his coat and left. *Id.* at \*8.

On appeal to the state court, Cross argued that the trial court should have questioned the remaining jurors to determine whether there had been any taint. The state court held that Cross waived this issue by agreeing to Kortes's removal and not seeking any other remedial action. *See Cross*, 2003 WL 178802, at \*1. The state court noted that waiver was an established principle that Michigan courts regularly followed prior to Cross's 2001 trial. *See People v. Carter*, 462 Mich. 206, 219, 612 N.W.2d 144 (2000) (where defense counsel "clearly expressed satisfaction" with a trial court decision, a claim of error regarding the relevant

11

matters was waived).

Cross claims she did not waive the jury taint issue, but the colloquy shows otherwise. Not only did the trial judge offer to question Mr. Kortes, the judge also offered to "deal with it some other way, if you wish to do it." In offering to deal with the possible taint "in some other way," the trial court gave Cross the opportunity to have the jury examined for prejudice. Instead of availing herself to this, Cross and her attorney agreed to simply have Mr. Kortes removed from the jury. Cross's actions clearly demonstrate she waived the jury taint issue and the state court relied on her waiver to deny relief. Because waiver is an adequate and independent state ground to support the state court's decision, this Court is foreclosed from reviewing Cross's jury taint claim. *See Luberda v. Trippett*, 211 F.3d 1004, 1006-07 (6th Cir.2000).

In cases where a state prisoner has procedurally defaulted her federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *See Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991). Application of the cause and

12

prejudice test may be excused if a petitioner "presents an extraordinary case whereby a constitutional violation resulted in the conviction of one who is actually innocent." *Rust v. Zent,* 17 F.3d 155, 162 (6th Cir.1994).

Cross never alleged cause with respect to the jury taint issue. She also failed to allege actual prejudice or demonstrate how a fundamental miscarriage of justice might result from the failure to consider her jury taint claim. Finally, Cross has not alleged actual innocence. Accordingly, Cross is not entitled to habeas relief on her jury taint claim.

## B. Ineffective Assistance

To show ineffective assistance of counsel, a defendant must demonstrate: (1) her counsel's performance was deficient and (2) the deficient performance prejudiced the defense and deprived the defendant of a fair trial, a trial with a reliable result. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). When deciding if counsel's performance was deficient, *Strickland* requires that the inquiry "must be highly deferential":

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.... [A] court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.... A convicted defendant making a claim of ineffective assistance must identify the

acts or omissions of counsel that are alleged not to have been the
result of reasonable professional judgment.

*Id.* at 689-90.

In determining whether counsel's performance was prejudicial, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id.* A court need not address the question of competence if it is easier to dispose of the claim due to a lack of prejudice. *Id.* at 697; *Mallet v. United States,* 334 F.3d 491, 497 (6th Cir.2003).

Cross asserts that her trial counsel was ineffective because he failed to ask for a jury taint investigation, did not object to prosecutorial misconduct, and did not seek jury instructions concerning the Petitioner's "mere presence" or "bad acts." The state appellate court found that trial counsel was not ineffective with respect to the jury instructions because there was no evidence that Cross was merely present while other people committed the crimes and counsel could have validly omitted a bad acts instruction out of concern that such an instruction would have drawn further attention to bad deeds such as providing her sons with illegal substances. *See Cross*, 2003 WL 178802 *5 (citations omitted). The state

14

appellate court also concluded that Cross's prosecutorial misconduct claims could not be bases for relief because they were not preserved during trial. *See Cross*, 2003 WL 178802 at *3. The state appellate court explained that the contemporaneous objection rule, which was firmly established and regularly followed with respect to prosecutorial misconduct claims at the time of Cross's trial, required her to object to the alleged prosecutorial misconduct at the time it occurred. *Id.*

The district court correctly agreed with the state court's reasoning about the jury instructions. *See Cross*, 2005 WL 675836 at *12. Also, the district court rightly decided that the state appellate court's denial of the prosecutorial misconduct claims was an adequate and independent ground that foreclosed review. *Id.* at *10. Beyond these insurmountable problems, Cross's ineffective assistance claim is doomed by the fact she makes nothing more than conclusory assertions about actual prejudice. Her conclusory assertions fall far short of showing actual prejudice.

## C. Sufficiency of the Evidence

The Supreme Court has held that "proof of a criminal charge beyond a reasonable doubt is constitutionally required" by the due process guarantee of the Fourteenth Amendment. *In re Winship,* 397 U.S. 358, 362, 90 S.Ct. 1068, 1071,

25 L.Ed.2d 368 (1970) (citations omitted). In *Jackson,* the Court further explained that in order for a conviction to be supported by sufficient evidence, it must be possible for some rational trier of fact to "have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319. The evidence must be viewed "in the light most favorable to the prosecution." *Id.* This "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law ." *Id.* at 324 n.16.

Cross contends that there was insufficient evidence to support her convictions of conspiracy to commit first-degree murder, solicitation of first-degree murder, and first-degree premeditated murder. The state appellate court rejected her contention, stating:

> With regard to [her] conviction of conspiracy to commit first-degree murder, conspiracy consists, in pertinent part, of a mutual agreement between two or more people to commit a criminal act. *People v. Buck,* 197 Mich.App. 404, 411-412; 496 N.W.2d 321 (1992), *reversed in part on other grounds sub nom People v. Holcomb,* 444 Mich. 853 (1993). To prove conspiracy to commit first-degree murder, it must be shown that "each conspirator had the requisite intent to commit the murder." *Id.* at 412. John Benjamin testified that he and [Cross] agreed that he should approach an acquaintance and offer him money and a vehicle in return for killing the victim. Further, John Benjamin testified that he asked Gordon Dittmer to commit the murder and that [Cross] gave him a check to pay Dittmer, which constituted evidence that both John Benjamin and defendant actually had an intent to murder the victim. There was sufficient evidence to support [Cross's] conspiracy conviction.

16

Turning to [Cross's] conviction of solicitation of murder, the law provides that a person who aids or abets the commission of a crime may be convicted as if that person directly committed the crime. *People v. Izarraras-Placante,* 246 Mich.App. 490, 495; 633 N.W.2d 18 (2001). A finding that a defendant aided and abetted a crime requires evidence that (1) the crime was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or knew that the principal intended its commission when the defendant gave aid and encouragement. *Id.* at 495-496. Solicitation of murder consists of (1) the solicitor purposely seeking to have someone killed and (2) trying to engage someone to do the killing. *People v. Sexton,* 250 Mich.App. 211, 227; 646 N.W.2d 875 (2002). John Benjamin's testimony that he promised Dittmer money and a vehicle in payment for killing the victim was sufficient to establish that John Benjamin committed the crime of solicitation of murder. His testimony that [Cross] agreed with him to ask another man to kill the victim in return for payment was sufficient to establish that she gave encouragement that assisted the solicitation and that she intended the commission of the crime. Thus, there was sufficient evidence to support [Cross's] solicitation of murder conviction.

With regard to [Cross's] murder conviction, first-degree premeditated murder consists of an intentional killing of a victim that was premeditated and deliberate. *People v. Abraham,* 234 Mich.App. 640, 656, 599 N.W.2d 736 (1999). The evidence that the victim died from a gunshot wound to the head, that Dittmer told two people that he shot the victim, and that he told one of them that he was supposed to be paid for the killing was sufficient evidence that Dittmer committed first-degree premeditated murder. This evidence together with that discussed above regarding [Cross] giving funds to John Benjamin to pay Dittmer for the killing, constitutes sufficient evidence to support a conclusion that [Cross] aided and abetted first-degree premeditated murder by providing encouragement that assisted the commission of the crime and intended its commission. Thus, there was sufficient evidence to support [Cross's] first-degree murder conviction.

17

*Cross,* 2003 WL 178802 at *1-*2.

In the instant appeal, Cross essentially argues that the evidence was insufficient because the prosecution's witnesses lacked credibility. By delivering its guilty verdicts, the jury obviously concluded that the witnesses were believable. Regardless, the district court found the state court's analysis constituted a proper application of the *Jackson* standard and Cross offers nothing to show that the district court erred.

### 4. Cumulative Error Claim

"[T]he law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue." *Williams v. Anderson,* 460 F.3d 789, 816 (6th Cir.2006) (citing *Moore v. Parker,* 425 F.3d 250, 256 (6th Cir.2005)). Thus, even if any of the actions previously mentioned were errors, they are not cognizable as cumulative error and provide no basis for relief.

## V.  CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's decision to deny Petitioner Cross's habeas petition.